I, Jon G. Gruenberg, being duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND TASK FORCE OFFICER BACKGROUND**

1.       I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 for the following locations:

- ARON McKILLIPS's residence at 527½ Pearl Street Sandusky, Ohio 44870 and its detached garage; and
- ARON McKILLIPS's vehicle, a 2015 White Ford Flex SUV, Ohio license plate JAH 5434, VIN 2FMGK5D80FBA16465, registered to McKILLIPS.

Each location is described in more detail in the attachment A submitted in the application for each warrant.  The items to be seized will also be described in an Attachment B submitted with the application for each warrant.

2.       This affidavit is also submitted in support of an arrest warrant and criminal complaint under Federal Rules of Criminal Procedure 3 and 4 for ARON McKILLIPS.  The complaint alleges violation of 18 U.S.C. § 922(o) (unlawful possession of a machine gun) and 18 U.S.C. § 875(c) (interstate communication of threats).

3.       I am a Task Force Officer with the Federal Bureau of Investigation ("FBI"), Cleveland Division. I have been so employed since March of 2022 and as such have been assigned to investigate cases in the Northern District of Ohio. I am also a detective with the Toledo Police Department in Toledo, Ohio, and have been employed since 2013. I have training and experience in interviewing and interrogation techniques, arrests, search and seizure, search warrant applications, and various other procedures. In the course of conducting investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and executing search warrants. As such, I am a law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, and officer of the United States empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.       The facts in this affidavit come from personal observations, my training and experience, and information obtained from other agents, task force officers, local police officers, and witnesses. Any information pertaining to vehicles and registrations, personal data on subjects, and record checks, has been obtained through the Law Enforcement Automated Data

System ("LEADS"), various state driver's license motor vehicle records, online database searches or the National Crime Information Center ("NCIC") computers, and various open-source databases such as LexisNexis.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Multiple distinct confidential human sources have provided information about McKILLIPS. Each confidential human source will be referred to as CHS, and a numeral, indicating which source reported on which information (i.e. CHS 1, CHS 2 . . .) Reporting provided by CHSs in this affidavit come from personal interaction with ARON McKILLIPS as well as from social media outlets (i.e. Facebook) and encrypted chat forums and messaging applications (i.e. Discord, Keybase, and Signal). They know his identity by the messages, photographs, videos, and audio recordings used in the group chats.  In several of the reporting by CHS's, a screenshot, photograph, video or audio message was provided to Law Enforcement and is referenced below each paragraph as a figure in Attachment C. In many of the chat groups/forums there are users and members from multiple states within the United States.  These applications are commonly used on "smart" cellular telephones. In this reporting McKILLIPS uses an array of monikers or usernames, all of which have been identified as McKILLIPS.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that ARON McKILLIPS has violated Title 18 U.S.C. § 922(o) and 18 U.S.C. § 875(c), and thus subject to arrest on a criminal complaint.  There is also probable cause the search locations and seize items as described in paragraph 1 above.

## PROBABLE CAUSE

7.      MCKILLPS is a well-known member of the Boogaloo Boys (or "Boogaloo Bois") movement/group.  Boogaloo Boys are described as an anti-government extremist group and are often referred to as "Bois" or "Boogs."  McKILLIPS is also reported to be a member of the New Sons of Liberty (NSOL) militia group. McKILLIPS has and does travel to multiple jurisdictions within the United States for protests, meetings and trainings with other members of the Boogaloo Boys movement.

8.      On December 31, 2020, McKILLIPS was stopped for a traffic violation by the Sandusky Police Department. He submitted to a pat down of his person and gave consent to a

search of his vehicle. Officers located two marijuana roaches in the center console and seized them. In the rear of the vehicle officers located several hundred rounds of 5.56mm and 9mm ammunition, body armor, AR-15 rifle upper received, parachute flares, medical kits, firearm components, and military style equipment. McKILLIPS was issued a citation and released.

9.      On February 15, 2021, CHS 1 provided screenshots of messages McKILLIPS posted in a Keybase[1] chat group. (Figure 1A).  According to CHS 1's information, McKILLIPS used the name "prisonoh" (or "Prison OH") while using Keybase.  According to the screenshots, McKILLIPS indicated that the government took some money from him and he still owed the government money.  Prisonoh then indicated that "Ive got some planning to do brother," and that "its time i do something for the movement."  Prisonoh then re-iterated that he had planning to do, and said "The fight may be coming to my door sooner than later."  Someone responding to prisonoh implored him to reveal what he planned to do, but pirsonoh responded "Itll be oaky."  Prisonoh also offered to sell an AR-15 type rifle fitted with what appears to be a grenade launcher, along with three "flash bangs" and a "triple pouch."  (Figure 1B).

10.      Around January 21, 2021, CHS 6 provided screenshots of a Signal[2] user profile for "Prison (NW-OH) NSOL."  The profile gave a phone number of 419-984-4225.  (Figure 2A). T-Mobile records from September 2022 showed subscriber information for the phone number 419-984-4225 as "AARON" MCKILLIPS with an address of 527 Pearl St. Sandusky, Ohio 44870.  CHS 6 also provided a screenshot of a photo of an AR-15 type rifle fitted with a grenade launcher.  (Figure 2B).  The screenshot indicates the photo was posted by "Prison (NW-OH) NSOL" on January 14, 2021.  The rifle is lying on a red and black blanket and appears to be the same rifle depicted in Figure 1B posted by "Prisonoh" on the Keybase messaging platform.

11.      Around March 28, 2021, CHS 2 reported that McKILLIPS posted in a Signal chat group named "Redacted Revolution" that he had not threatened a user thought to be a law enforcement informant, but stated "Anyone that IS proven to be a Fed or insider does deserve their fucking legs broke." (Figure 3).  According to CHS 2's information, McKILLIPS used the

---

[1] Keybase is a key directory that maps social medial identities to encryption keys in a publicly auditable manner.  Additionally, it offers an end-to-end encrypted chat and cloud storage system. I know from my training and experience those engaged in nefarious conduct often use end-to-end encryption software to try and circumvent detection by law enforcement and make it difficult to obtain.

[2] Signal is a cross-platform centralized encrypted instant messaging service.

name "Prison (NW-OH) NSOL" when using Signal.  Multiple CHS's have provided "screenshots" of McKILLIPS' usernames/monikers and phone number (419-984-4225).

12.     On April 9, 2021, CHS 3 reported that on April 3, 2021, while visiting Lansing, Michigan, McKILLIPS provided Drop-In Auto Sears, commonly referred to as a "DIAS" or "snake," to several Boogaloo Boys.  These DIAS's were constructed from metal and made to be placed in an AR-15, converting it from a semi-automatic rifle to a fully automatic rifle.  The DIAS itself is considered an illegal machine gun.  McKILLIPS instructed each person on how the DIAS worked.  Once installed in their rifles, McKILLIPS performed a function check on the weapons to show its functionality.  He also showed others how to make a DIAS.

13.     On April 8, 2021, CHS 3 reported that McKILLIPS was manufacturing inserts to make AK-47 and AR pistol platforms fully automatic.  CHS 3 reported on a video of a male, likely McKILLIPS, firing a fully automatic weapon.

14.     On April 12, 2021, CHS 3 reported that around April 9, 2021, McKILLIPS was again involved in a discussion about killing informants on a Signal chat group.  In this chat, he also said "I'm not for that, I'm here to stack red coats and take back all our freedoms, not clout, not pics, fuck that." McKILLIPS also discussed being the only "Ohio boi who went to ledbetters to fuck soup and fight and I could have air time. I don't want that, I want actual progress." (Figure 4).  Boogaloo Boys commonly refer to federal agents as "red coats," and various federal law enforcement agencies as "soup" or "alphabet soup" due to the use of three-letter abbreviations for the FBI, DEA, ATF, etc.

15.     A witness was interviewed by Columbus Police detectives on April 21, 2021 in relation to a possible protest or rally in Columbus due to an officer-involved shooting. The witness claimed McKILLIPS said in a chat group, "when do we start doing something? Cause I'm getting pissed more and more every day when they get away with murder." In response to conversations about a Boogaloo member named Carillo who killed a law enforcement officer in California, McKILLIPS said "if yall see people bad mouth me like Carillo, snap 'em." In response to a post stating "haven't we all had that urge?" McKILLIPS posted, "I have that though daily." The witness claimed that McKILLIPS was likely making illegal firearms.  The witness stated that they had seen one of the firearms, knowing it was fully automatic, as it had a

third hole that had been drilled out. The witness also stated that McKILLIPS made statements about drilling out the top of his door and filling it with Tannerite.[3]

16.     The same witness was interviewed again on April 29, 2021, stating that McKILLIPS tried to sell them an M-45 and an AK-47, both with fully automatic capabilities. McKILLIPS was also willing to convert the witness's AK-47 to a fully automatic firearm. The witness also mentioned McKILLIPS is a sector leader of the NSOL-OH (New Sons of Liberty,) in which members have discussed in the Signal chat group about attacking the power grid and taking out sub-stations.

17.     Around April 25, 2021, CHS 3 reported that McKILLIPS posted audio files in a Signal chat group in which he said if the 8th does not go well (likely referring to protest at the Richland County Jail detailed in paragraph 19), he would either be out of the movement, or he would go on a shooting spree targeting police or feds. I have listened to the audio files and CHS 3's description of them is accurate.

18.     On May 4, 2021, CHS 4 reported that McKILLIPS posted in a Signal chat group about being upset at the feds and law enforcement. He said he was ready to die for the "Boog." McKILLIPS then made some comments about the death squads in Columbia and that he wanted to travel to Columbia.

19.     On May 10, 2021, CHS 4 reported that on May 8, 2021, McKILLIPS participated in a protest at the Richland County Jail in Mansfield, Ohio, to support an inmate who had been killed by corrections officers. After the protest, the protestors arrived at a house for a party. According to CHS 4, during the party, McKILLIPS stated he had an AK-47 that he traded for a .308 that he then traded for a grenade launcher and some "primo cocaine." McKILLIPS said his grenade launcher was firing pin activated and he had the knowledge to make high explosive rounds that he could shoot out of the launcher. Also during the party, McKILLIPS discussed with the other individuals that he could modify semi-automatic weapons and convert them to fully automatic by using DIAS's. He had not brought "banding" so he could not manufacture the device at the party, but he explained how to make the devices. He also claimed he wanted to

---

[3] Tannerite is an explosive available to consumers that detonates on high-velocity impact. It is thus often used in firearms targets, causing the targets to explode when hit with a firearm round. Pouring Tannerite into a door could cause the door to explode if it was shot with a rifle, perhaps during an anticipated stand-off with law enforcement officers.

build a short-barreled rifle. CHS 4 also reported that McKILLIPS claimed he wanted to shoot someone in the chest with a grenade launcher he allegedly had acquired. McKILLIPS also said if he were to be arrested, he would not be taken alive, noting that he slept with his rifle.

20.     On June 7, 2021, CHS 4 reported about a Black Lives Matter protest/rally in Louisville, Kentucky on May 28, 2021, that they attended.  The protest involved Boogaloo Boys and Antifa members.  McKILLIPS and other Boogaloo Boys provided security and blocked off traffic for the protestors. After the protest, the participants hung out at a house. At the house, McKILLIPS again showed everyone how to make a DIAS. He created a "meme" that showed how to make them. McKILLIPS also talked about drilling a third hole on his gun to make a select fire button. He had a 37mm tube mounted on his weapon and was discussing the flash bangs that he had for it. He also mentioned that he wanted to make some type of high explosive round to put into this tube.  Through training an experience, I know that a "select fire button" refers to a switch on a machinegun that allows its operator to choose whether the weapon will fire in a semi-automatic or full-automatic mode.  I also know that some versions of an AR-15 are equipped with a 37mm tube used for launching various projectiles, including grenades.

21.     On July 5, 2021, CHS 5 reported that a Signal user claimed to have had a firearm suppressor ready for McKILLIPS, he just had to figured out how to ship it to McKILLIPS. The Signal user was thinking about sending it in pieces, presumably to avoid law enforcement scrutiny. (Figure 5)

22.     On July 6, 2021, CHS 6 reported that McKILLIPS had posted recordings in a Signal chat room in which he talked about burning down federal buildings and shooting federal agents.  Agents obtained copies of the recording from CHS 6.  I have listened to the recordings, and they contain the following statements:

- "Fuck that. I don't believe in anything. I'm only here for the violence so-we gonna fucking start killing people like federal agents and shit or are we gonna fucking sit here and jerk off?"

- "I just wanna blow up the IRS."

- "Some crazy mother fucker hops in the chat-starts talking about killing federal agents and police and all the sudden everybody fucking disappears-fucking [unintelligible]."

- "See, I'm down to go to like riots and shit like that but as long as you're not burning down a fucking Target or some fucking stupid like that, fucking-fuck that wow.  I would really like to uh-put that energy toward like federal buildings or uh police departments."

- "Yes, fuck mass corporations but still I'd rather put that energy towards fucking the White House."

- "Alright, alright so fuck Target. Fuck Walmart. Fuck all those one fucking corporations.  Don't attack the mom and pa shops and we're fucking good.  Burn down and loot Target.  Burn down and loot the fucking Walmart. Do the fucking thing. Do whatever you're gonna do. Leave Sears alone cause they got really good [unintelligible] selection of tools and stuff cause I'm poor. But all the other ones are game but it would be a lot better if we just burned down a federal building straight the fuck up or even just fucking shot it up. I don't give a fuck. At this point, we could just blow the bitch up with fireworks. Fucking something. Anything is better than burning down a fucking grocery store. What is being accomplished out of blowing up or burning down a God damned grocery store?"

- "Exactly, so that's what I'm saying. We need to fucking target the federal buildings and the fucking state buildings and shit like that because who's gonna be affected that's a commoner? [Blowing air noise] Get off me fly! But who's gonna be affected that's a commoner if we go after federal buildings? Leave the fucking grocery stores alone.  Those are the places that normal people need. We do not need government buildings. We do not need them.  They are useless. Not to mention they're basically fucking ours-our taxpayers-like our tax dollars fucking paid for those sons of bitches so I want my own mother fucking government building and it could be all of ours if we could take our fucking thumbs out of our asses."

- "Yeah, that's about plum fucking retarded, not even gonna lie. So let me get this straight. Riot, loot-don't give a hoot. Burn down the local Target and fucking Walmart. Get a free television. That's totally cool because government won't lock us down, but-shooting federal agents, government officials and police will institute them to lock us down. No, no it will not. No the fuck it will not.  They

will be dead. Who is gonna give the order if they are fucking gone? Deleted. Un-fucking-alived."

- "This is exactly what I would go, ok, you ready for it? Here's this little play-by-play, ok. So, here it is. Right here. Ready? Ready? Ok, so, we take care of all our governing officials yadda yadda around our area then some outside governing force goes out and does this thing, you know, cause they think that there's nobody there, yadda yadda. So, uh, they start saying ok we're gonna institute, we're gonna send yadda yadda into this area to lock it down and such and such blah blah blah blah blah. And you know what happened? Within five minutes of that fucking broadcast being set up, if we all weren't a bunch of fucking pussies, somebody would drive a fucking old, beat up ass Honda hatchback fucking 1986 piece of shit loaded with fucking explosives right into that fucking news station and just ghost ride the whip right into that bitch and shoot it. Shoot. It. Blow it the fuck up. If you need to get a Nokia phone, hook it up to some wires, and call that bitch so that there's a fucking connection on the circuit that goes and ignites that fucking powder. Blow that bitch up. So whoever is saying that shit just fucked around and found out. They will be un-alived."

- "I'm just saying-if I get added to some fucking flag-when gov-fucking feds decide to kill me or fucking shoot me, blow up my house, do whatever, shoot me through my window. I don't give a fuck. If I get added to a fucking flag and nobody is out the killing the people that killed me, the fuck is the use of this movement? Huh, huh, huh, huh, huh? What the fuck is the use of it? This shit started out being a fucking way to kill feds.  That's what we were about. The main fucking beginning was kill feds, kill police, kill government officials. Kill them. Murder them. Un-alive them. Delete them. Get rid of them. And then it became 'we're gonna do this peaceful'.  Fuck that."

- "Fuck that, we're not gonna be on the flag dog, we're going to be on the new, boy."

- "Well, fucking tell me about it.  I got in arguments with people and that's why I straight up left everything and then didn't give a fuck.  I'm not here for the fucking clout, I'm not here for fucking fame. I'm not here for fucking anything.

I'm here for fucking violence and I'm saying that as I walk out to my fucking car."

- "That's bringing me to my other point, that you don't see any of my guys fucking-an-, like anybody with incel in their name or anything like that actually in this chat or any chat. Because we don't care about these chats.  We know that we are gonna get disowned, so we don't feel like you know, going and slotting feds and shit, but…but-when it does go down, which we all know it will-hell, I got my door kicked in. They're gonna have a fun time coming up my stairs cause one, they're fucking sketchy. Two, it's a fucking bottle neck. Go ahead. Again, I make machine guns for fun. I will dump nine hundred rounds per minute down my stairwell and eviscerate anything that is there, and God forbid if I actually make it to my fucking little lock box. Ugh. If I make it to my lockbox, anybody outside of my house is therefore a perforated good sir."

23.     On July 16, 2021, CHS 4 reported having a recorded conversation with McKILLIPS, where McKILLIPS discussed that he had bought a new firearm because the different type of gas system made it better for automatic fire. McKILLIPS also discusses possibly purchasing a firearm for someone in Sandusky and meeting them halfway. I have listened to the recording and CHS 4's description of the conversation is accurate.  CHS 4 also provided a photograph of McKILLIPS's new firearm, which appears to be lying on a bed. (Figure 6)

24.     On July 19, 2021, CHS 3 reported about an ongoing situation happening in the state of Oregon.  CHS 3 reported that Matthew Pierro reached out to McKILLIPS and other Boogaloo members on Signal for assistance regarding U.S. Marshals attempting to arrest Pierro. McKILLIPS posted Pierro's address to Signal and said "Time is ticking." Boogaloo members then started coordinating to assist Pierro either evade law enforcement or fight. McKILLIPS stated he was ready to go and then complained about infighting, stating "we needed to get this guy some fucking help." He continued to organize and encourage Boogaloo members to travel to Pierro's house to help get Pierro out. McKILLIPS believed numbers were important. Additionally, McKILLIPS stated he had reached out to his "gun friend in Texas" and that the friend could provide bigger guns if needed, to include RPGs and belt-fed weapons. McKILLIPS

also made statements hoping that the situation would be seen as the "next Ruby Ridge," a reference to a violent standoff in Idaho when U.S. Marshals initiated action to arrest a suspect.

25.     On July 21, 2021, CHS 3 reported that McKILLIPS left two recorded messages in a large Signal chat group.  One of the messages referred to how MCKILLPS, while in Lansing, Michigan on April 24, 2021, again provided the means to convert multiple Boogaloo Boys' rifles into machineguns. McKILLIPS stated in the recording, "I literally handed out machine guns in Michigan."  I have listened to these recordings, and CHS 3's description of them is accurate.

26.     On July 21, 2021, CHS 3 reported that McKILLIPS had posted a voice recorded message in a large Boogaloo Boys Signal group in which he discussed going to the Columbus, Ohio, ATF office to conduct an attack. McKILLIPS stated in the recording, "We can go to the ATF office here in Columbus, and I'm totally down and everybody is like about it, so I don't know what's going to happen." I have listened to this recording, and CHS 3's description of it is accurate.

27.     On July 30, 2021, CHS 3 reported that as of July 28, 2021, McKILLIPS created a new Signal group in which the conversation centered on efforts to free Christopher Ledbetter and to get him and his mother out of the country. McKILLIPS posted an audio message saying they could manufacture breaching charges, they just needed to figure out who had the "Anarchist cookbook." Then said, "If I can make machine guns I can make bombs." Signal user "FloresMopar" posted instructions on how to make bombs. McKILLIPS asked if anyone had a connection for bombs. Later, in response to a request for ammonium nitrate, McKILLIPS said he could find ammonium sulfate. The group discussed opsec (operational security) and said if a fed was in the group they already had everything they needed to get them with intent. (Figure 7)

28.     On September 3, 2021, CHS 5 reported that on September 1, 2021, in a private chat, McKILLIPS said he wasn't suicidal, just knew what was coming. He said "just seeing things that make me mad cuz we ain't standin up like we need yet" but said "Ain't Got a federal badge off a corpse yet, so my time here ain't near done yet lol." He also said "soon enough we'll have no option other than violence." McKILLIPS openly called himself an accelerationist. (Figure 8)

29.     On September 11, 2021, McKILLIPS was stopped by police for speeding in Tiffin, Ohio. The officer said McKILLIPS seemed very nervous and had bloodshot eyes. The officer asked if he had any weapons in the vehicle and he pointed to a rifle in the back seat. The

officer determined McKILLIPS was improperly carrying the rifle and seized it. McKILLIPS became angry and started yelling from the back of the patrol car. (McKILLIPS later agreed to a negotiated plea of guilty for improper handling of a firearm in a motor vehicle with a forfeiture specification. The offense was classified as a misdemeanor of the 4th degree. McKILLIPS was sentenced to five days in the Seneca County jail with 5 days credit applied.)

30.     On September 13, 2021, CHS 4 reported that on September 10, 2021, McKILLIPS told an individual he could get as many DIAS's as needed and that he did not charge his "bois" for freedom. McKILLIPS also offered to get banding so the individual could make their own DIAS. McKILLIPS was planning on buying a drum [magazine] for his AR. Through training and experience, I know that an AR-15 rifles are typically fed ammunition through a detachable magazine that holds approximately 30 rounds of ammunition.  After firing the 30-rounds, the user must stop firing and either re-load the magazine or remove the empty magazine and insert a pre-loaded magazine.  I am also aware that individuals may purchase a circular drum magazine for an AR-15.  Some of these magazines can hold up to 100 rounds, meaning the user can fire 100 rounds of ammunition without reloading.  If a drum magazine were coupled with a DIAS, the user could fire 100 rounds of ammunition with a single, sustained trigger pull and without reloading.

31.     On September 13, 2021, CHS 5 reported that on September 11, 2021, McKILLIPS posted audio messages about being stopped by law enforcement and having his AR seized. He said "Yeah! So guess what, in about two weeks I'm going to fucking shoot some cops so be fucking ready when you see it on the fucking news." He later posted that he wanted to "commit war crimes."  I have listened to the audio recordings, and CHS 5's description of them is accurate.   During the same reporting, CHS 5 provided that as of September 12, 2021, McKILLIPS had calmed down a bit but was still upset.

32.     On September 22, 2021, CHS 4 reported to have directly received four audio messages from McKILLIPS on September 21, 2021.  CHS 4 described the audio recordings as follows: the audio messages discuss McKILLIPS's legal troubles. In the messages he stated he knew someone who had a similar encounter with the Ohio Highway Patrol regarding a seized weapon in a vehicle. This individual rolled over and accepted the charge, but McKILLIPS was going to win. He said if he didn't win he would find another weapon, ammo, and get guys who felt the same way he did. He said he was going to put a call out when it goes down. He was

going to call his Boogaloo friends. McKILLIPS said he had a gut feeling that it was about to happen and it was bound to happen. McKILLIPS was of the mindset that if the police came to his house it would be a Duncan Lemp scenario. and he would not comply. McKILLIPS stated he did not have money for an attorney and that he would have to have his own personal Boog.

33.     On October 6, 2021, CHS 3 reported the following:

a.   On September 30, 2021, McKILLIPS posted an audio recording.  CHS 4 described the recording as saying law enforcement would either return his stuff in a couple of weeks or that they would come for him and he would shoot it out with them (likely referring to his arrest and firearm being seized by the police on September 11th, 2021.)

b.   On October 2, 2021, McKILLIPS discussed using a pipe bomb against the child support office because they charged a processing fee instead of giving all the money to the mother of his children.

c.   On October 6, 2021, McKILLIPS mentioned having his guns ready and knowing that his time was coming up.

34.     On October 28, 2021, CHS 3 reported that McKILLIPS was still posting messages about wanting to kill police officers after his arrest.

35.     On November 4, 2021, CHS 4 reported that McKILLIPS was still in the national Boogaloo Signal groups but had been kicked out of the private groups. This was done for all Boogaloo members in legal trouble because other Boogaloo members were worried police could get into their phones and see their conversations.

36.     On January 17, 2022, CHS 4 reported that on January 16, 2022, McKILLIPS said he needed a 10.5 inch AR barrel and was looking for a handguard.  CHS 4 said McKILLIPS was trying to build an AR pistol. On January 17, 2022, McKILLIPS discussed trading gun parts and cash for parts. McKILLIPS said a Signal user was giving him his old pistol back in parts and that he was in need of a handguard. McKILLIPS said a quad rail, 10 inch, and cheap handguard was preferred. (Figure 9).  Through training and experience, I know that a "quad rail" refers to a AR-15 rifle part that allows the owner to attach various shooting accessories, such as aiming scopes, laser sighting mechanisms, and flashlights.

37.     On January 22, 2022 CHS 4 reported that on January 21, 2022, McKILLIPS texted CHS 4, "Building an AR tomorrow" with the "praying hands" emoji.  (Figure 10)

38.     On January 22, 2022, McKILLIPS met with CHS 4 in person in McKILLIPS's vehicle. The meet was covertly recorded. CHS 4 and McKILLIPS discussed DIASs. McKILLIPS brought 16 gauge banding steel he had bought on Amazon to trade for a handguard. CHS 4 did not have a handguard and offered cash instead. McKILLIPS declined. McKILLIPS gave CHS 4 an approximately foot long piece of steel and a shorter metal piece banding. McKILLIPS attempted to cut into the steel banding but was unable to do so because he lacked the proper tools. McKILLIPS showed CHS 4 how the DIAS worked. McKILLIPS said he trimmed down a piece of a banding based off a Facebook meme. He tested the device and claimed it worked. McKILLIPS said he may have had a guy who could get him a "Glock switch." [4] He also talked about a gun building competition on Twitter. McKILLIPS said he lived too close to the police department but had fired his full auto firearms in a farmer's field.

39.     On January 24, 2022, CHS 4 reported that on January 23, 2022, McKILLIPS sent CHS 4 an image of a complete rifle build with a magazine inserted and foregrip with a stock, optic, and handguard. (Figures 11A and 11B)

40.     On April 7, 2022, CHS 4 re-established contact with McKILLIPS. McKILLIPS claimed in the conversation that he had quit the "boog" and CHS 4 believed McKILLIPS was not talking to many people. (Figure 12)

41.     On April 11, 2022, CHS 5 reported that McKILLIPS posted a video of himself shooting a fully automatic weapon.  I have reviewed the video, and it appears to be a male, fitting the same physical description as McKILLIPS, firing an automatic weapon.  The individual's face, however, is hidden by a hooded sweatshirt.   CHS 5 also reported McKILLIPS was back in the Signal groups and back in the boog. McKILLIPS reportedly said he was ready to do God's work.

42.     On April 16, 2022, CHS 5 reported that McKILLIPS was back in the Signal chat groups and was "talking a big game." On April 16, 2022, McKILLIPS posted a picture of himself driving on the highway with the comment "omw to raid Columbus ATF office" in one of the Signal groups. (Figure 13)

---

[4] Based on my training and experience and discussion with other law enforcement officers, I know the phrase "glock switch" is another term for converting a Glock handgun into a full automatic.

43.     On April 29, 2022, CHS 3 reported that McKILLIPS posted a picture in a Signal chat group of what appeared to be someone pointing an AR-15 rifle at a patrol officer's vehicle across the street. The caption stated "Use language they will understand" and asked "Is this spicey enough?" (Figure 14).  The image included a red and black blanket similar to one appearing in an earlier image posted on social media websites by McKILLIPS showing an AR-15 style rifle, refer to Figure 2B.

44.     On April 30, 2022, CHS 7 reported that McKILLIPS engaged in a conversation with two other Boogaloo members, in a Signal chat group, in which they discussed shooting at a police station to prove that someone is not a "fed." (Figure 15A).  McKILLIPS also posted an image of an AR-15 style rifle on a red and black blanket and wrote "Oh no, someone stop me, I evaded taxes on this NFA item."  (Figure 15B).

45.     On May 1, 2022, CHS 5 reported that on April 30, 2022, McKILLIPS discussed firearms with other Boogaloo members. He told one member to get a Glock handgun instead of a Sig. When the other member said he couldn't because of the background check, McKILLIPS told him to have someone print the frame and buy a parts kit. The other member told McKILLIPS to put everything in his name and McKILLIPS said he did just that for one of his associates in the New Sons of Liberty (NSOL) and was willing to do the same for this member. CHS 5 also reported that McKILLIPS posted a picture of his AK and said he wants to turn this into "The country Concert 2," likely referencing the Las Vegas mass shooting in October of 2017. (Figure 16)

46.     On May 9, 2022, CHS 5 reported that on April 30, 2022, McKILLIPS posted a picture of his rifle pointing through his bedroom window at the street at a police car. He made a meme out of it. CHS 5 also reported that around May 6, 2022, McKILLIPS said he was going to blow up Facebook headquarters. (Figure 17)

47.     On May 15, 2022, CHS 8 reported that McKILLIPS posted a video of the Buffalo, New York, mass shooting onto a Boogaloo-based Signal chat group. McKILLIPS then posted in a Signal chat group that the ATF Columbus, Ohio, office was only two hours away (likely a reference to the Buffalo shooter driving across the state to conduct the shooting). (Figure 18)

48.     On May 17, 2022, CHS 5 reported that McKILLIPS and another Signal user threatened to kill a different Signal user because they believed that user was an informant for

either the FBI or ATF. McKILLIPS said the user would have a week before killing him. (Figure 19)

49.    On May 20, 2022, CHS 9 reported in a conversation on Signal about alleged informants in the group, McKILLIPS posted "Sorry I'm 5 blunts in and in a fuck with people mood. So should I got thru with it and get em taken out, or should I just take the bitch crying as a promise hell shut the fuck up/die in a ditch in a car accident? Oof, fuk, wrong chat." A user responded with "Honest Opinion?" and McKILLIPS posted "Takem out? Got it. This is my own answer to myself." Later in the chat McKILLIPS posted "And @thefedcucks, yes, I'm looking at getting your pet put down. You kill our dogs, we kill yours." (Figure 20)

50.    On May 29, 2022, CHS 2 reported that McKILLIPS posted in a Signal chat group, "I've been saying this awhile but noone wants to raid government building with me." When a user responded with "That's too much drama", McKILLIPS said "Not yet, not till I mail a feds head back to his wife." (Figure 21)

51.    On June 3, 2022, CHS 4 asked McKILLIPS if he had parts to turn Glocks into automatic weapons using a "glock switch."  McKILLIPS responded with "Yeee been able to make em faster with em already cut down to width. I'll have to bring some out that way when I go out there." (Figure 22)

52.    On June 13, 2022, CHS 5 reported that in response to a Signal user, saying he did not want to die of old age and was willing to die fighting because of the new gun legislation, and McKILLIPS posted "fuck legality, build machine guns, FUCK THE LAW." McKILLIPS also posted on an FBI HRT account about how they couldn't take "my boi Ledbetter alone, y'all were still shook even after he was cuffed, didn't come back for me either, weak body mfs." (Figure 23)

53.    On July 3, 2022, CHS 5 reported that McKILLIPS posted a couple of messages stating that he didn't want to live anymore. On July 3, 2022, McKILLIPS posted a video of a rifle that included a suppressor, the video again shows a similar red and black blanket, referred to in Figure 2B.  I have reviewed the video.  McKILLIPS said cops shot someone in Ohio so McKILLIPS said to burn them all. He posted a video of a cop killing someone.

54.    On July 13, 2022, CHS 4 reported McKILLIPS directly messaged CHS 4 on Signal. McKILLIPS expressed the following to CHS 4 (Figure 24):

- "2 of my nsol Bois got their guns taken for transporting them"

- "Gunna be a shame when getting quotas up, ends with officers down [shrugging emoji]" [SIC] and "No skin off my back dropping an oath breaker."
- CHS said it would be an interesting winter and McKILLIPS replied, "Id rather get this started in the fall"
- McKILLIPS advised the contact occurred in Seneca County, same as McKILLIPS. McKILLIPS said "Gunna suck for them when they're being hunted," referring to police.

55.     On July 17, 2022, CHS 4 sent $20 in US currency to McKILLIPS's residence at 527 ½ Pearl Street Sandusky, Ohio 44870, through the US Postal service, for the purchase of a DIAS.

56.     On July 18, 2022, CHS 5 reported that McKILLIPS in a Signal chat group if things get worse in Akron, Ohio (referring to the officer involved shooting) and the officer start "fukin with em lemme know I'll make a drive to smoke a hog." (Figure 25)

57.     On August 5, 2022, CHS 5 reported that McKILLIPS posted a video with his voice in the background. The video showed a bent metal piece that appeared to resemble a DIAS. McKILLIPS can be heard saying he doesn't know why people want these cool little coat hangers. McKILLIPS also posted a video of him driving with several pistol magazines and a pistol in the car with him. McKILLIPS was indicating he will not follow the laws and used the video as an example.  I have reviewed the two videos, and CHS 5's description of them is accurate.

58.     On August 10, 2022, CHS 5 reported that McKILLIPS posted a picture/website of a 3D printed rifle suppressor and asked another Signal user if he can make McKILLIPS one. The other user said he cannot because it is beyond what his 3D printer can produce. McKILLIPS said he will buy a "wish.com can" and that its "a 2 for 1, I get whisper pickle and a raid, gion to wish.com now." The user then told McKILLIPS to get a Maglite and freeze plugs from AutoZone to make a suppressor. The user posted a picture of parts and a picture of a rifle with a suppressor on it. McKILLIPS responds that he will trade a "dias for whisper pickle". (A whisper pickle is code for a suppressor.) McKILLIPS indicates he wants a suppressor: "I have a plan, and need to be quieter." (Figure 26)

59.     On September 7, 2022, CHS 4 met with McKILLIPS in an arranged meeting at 527 ½ Pearl Street Sandusky, Ohio 44870 (the residence of McKILLIPS.)  CHS 4 observed

McKILLIPS walk from the vicinity of 527 Pearl Street to CHS 4's vehicle.  During this meeting MCKILLPS entered CHS 4's vehicle, and manufactured a DIAS, fitting it into the lower receiver of a rifle, provided by CHS 4.  McKILLIPS also performed a function check of the DIAS while in the lower receiver. CHS 4 also provided McKILLIPS $100 in US currency during the meet. The meet was covertly recorded and surveilled by Task Force Officers and Special Agents of the FBI. After the meet CHS 4 met back with Task Force Officer (TFO) Jon Gruenberg and Special Agent (SA) Elizabeth Tran.  The DIAS manufactured by McKILLIPS and lower receiver were collected by SA Elizabeth Tran and TFO Jon Gruenberg.

60.     On October 14, 2022, CHS 5 reported that on September 7, 2022, McKILLIPS posted to a Boogaloo Signal chat group, stating that he believed he was going to be raided by law enforcement.  In response to being asked by a Signal user, McKILLIPS mentioned that he had sold a machine gun and "Needless to say 2 cops were on the corner I didn't notice at first, so now my AR is on my chest."  McKILLIPS also mentioned in the conversation, "plate carrier and AR will now be coming to work with me." (Figure 27)

61.     Of the CHS's reporting on McKILLIPS's threatening online communications, several of them are from states outside of Ohio.  In order to read those threatening communications, those communications necessarily would need to travel in interstate commerce from McKILLIPS's location in Ohio to readers outside of Ohio.

62.     On or about September 21, 2022, agents submitted the DIAS purchased from McKILLIPS by CHS 4 on September 7, 2022 to the ATF's Firearms Technology Criminal Branch in Martinsburg, West Virginia.  A Firearms Enforcement Officer tested the DIAS using an AR-15 type rifle from the ATF's collection.  After installing the DIAS, the officer test fired the rifle, using magazines containing one round, two rounds, and three rounds.  For the two and three round magazines, the rifle operated as a fully automatic machine gun.  In his report, the officer wrote "I inserted a magazine with three rounds of ammunition, chambered the first round, and pulled the trigger.  [The ATF rifle fitted with McKILLIPS's DIAS] fired all three rounds of ammunition automatically, without manual reloading, by a single function of the trigger.  I repeated this method of test-fire one additional time, achieving the same result."  The officer achieved the same results with the two round magazine.  The one round magazine fired only the single round as expected.

63.     The Firearms Enforcement Officer's report also explains that the term "machinegun" in 18 U.S.C. § 924(a)(24) includes not only any weapon that shoots automatically more than one shot without manual reloading by a single function of the trigger, but also "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possess or under the control of a person."  The officer finally concluded that McKILLIPS's DIAS sold to CHS 4 "is a part designed and intended solely and exclusively, for use in converting a weapon into a machinegun; therefore, [it] is a 'machinegun' as defined in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b)."

64.     As mentioned, this affidavit is offered in support of search warrants for McKILLIPS's residence (including the detached garage) and vehicle.  Probable cause exists to search McKILLIPS's residence because individuals are likely to keep personal items, such as firearms and weapons, at their homes.   CHS 4 also drove to McKILLIPS's residence where the two met in CHS 4's car and McKILLIPS's created a DIAS which he then sold to CHS 4. McKILLIPS also posted numerous pictures of firearms on social media sites, as recounted in the affidavit and Attachment C.  Those images show firearms in what appear to be bedroom settings, *i.e.*, propped against what appears to be a dresser, and lying on a blanket, bed or couch.  It thus seems likely that evidence of McKILLIPS's efforts to manufacture and possess machineguns will be found at his residence.  McKILLIPS also needs banding materials and tools to make DIAS's.  At one point while meeting with a CHS, McKILLIPS was unable to cut banding material intended to be used for a DIAS.  In my experience, individuals frequently store tools and bulk materials (such as metal banding) in garages at their residences.  Garages are also frequently secured with locks, and may be suitable for storing firearms, suppressors, ammunition, and similar items.  There is thus probable cause to search the detached garage at 527 Pearl Street.

65.     McKILLIPS also has a prominent online presence on social media sites used by the Boogaloo Boys movement.  He used these sites both to further his involvement with illegal machineguns and to make threatening communications.  In order to access those sites, McKILLIPS must use one or more electronic devices with internet accessibility.  McKILLIPS's smart phone is the most likely device one would use to communicate on social media.  But one may also use a tablet, laptop, or desktop computer.  I know that individuals commonly store

these devices at their homes.  I am also aware that participants in anti-government movements like the Boogaloo Boys may keep other records of their involvement in these movements at their homes, such as writings, propaganda, and similar material.  I thus believe there is probable cause to search McKILLIPS's residence for evidence of making threatening communications.

66.     For similar reasons, there is probable cause to search McKILLIPS's personal vehicle.  Firearms and related parts, electronic devices, and other material is personal and portable.  These items can easily be transported in a vehicle and often are.  McKILLIPS, moreover, indicated his willingness to travel to assist Boogaloo Boys in need and at one point said he would travel to "smoke a hog," meaning kill a law enforcement officer.  McKILLIPS also boasted of "literally handing out machine guns in Michigan."  It thus seems likely that evidence of McKILLIPS firearms possession will be found in his vehicle.  McKILLIPS's travels, moreover, appear closely related to his involvement in the Boogaloo Boys movement, which in turn is a motivating factor behind his threatening communications.  It thus seems likely that evidence of his threatening communications will be found in his vehicle.

67.     Due to the foregoing, there is probable cause to search the property described in Attachment A and seize the items in Attachment B submitted with each respective warrant application.  There is also probable cause to issue a criminal complaint and arrest warrant for McKILLIPS for violation of 18 U.S.C. § 922(o) and 18 U.S.C. § 875(c).

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

68.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the location described in Attachment A, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

69.     *Probable cause.*  I submit that if a computer or storage medium is found at the location described in Attachment A, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium found at the location described in Attachment A because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

20

Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

71.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

72. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

73.    I submit that this affidavit supports probable cause for a warrant to search the location described in the relevant Attachment A submitted with each warrant application and seize the items described in the relevant Attachment B submitted with each warrant application.

74.    I likewise submit that there is probable cause to issue a complaint and arrest warrant for ARON MCKILLIPS for the offenses identified in 18 U.S.C. § 922(o) and 18 U.S.C. § 875(c).

_____
Jon G. Gruenberg
Task Force Officer Federal Bureau of Investigation

This affidavit was sworn to by the affiant by telephone after
submitted by reliable electronic means per Fed. R. Crim. P. 4.1, 41(d)
(3),  this 31st day of October 2022.

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

25